ARCHIBALD C. GODDIN, Plaintiff in Error, *v.* LOUIS A. WELTON *et al.*, Defendants in Error.

*Boats and Vessels—Charter Party—Loss.*—In a charter party of a boat to run on the Missouri river, it was stipulated that "in case of loss the boat should be at the risk of the owners;" *held,* that the loss contemplated was not the total destruction of the boat, but such a loss as would entirely defeat the object of the contract, the running of the boat.

*Error to St. Louis Court of Common Pleas.*

This action was brought upon a supposed liability of defendants originating out of the following charter party: "We have this day chartered of A. C. Goddin the steamer Keystone, with her fixtures, tackle, &c., to be run in the Missouri river for the term of one month, for which we hereby obligate ourselves to pay the sum of fifteen hundred dollars; and if we elect to keep her longer, hereby bind and obligate ourselves to keep her for three months from date, or until

the close of navigation in said river, and pay in considera-
tion of the use of the boat at the rate of one thousand dol-
lars per month, charter money, to be paid monthly at the
office of Messrs. J. O. Carson & Co. We further obligate
and bind ourselves to have the boat well officered and care-
fully handled and taken care of, and returned to said God-
den at the wharf in the city of St. Louis, in as good order
as she now is (ordinary wear and tear excepted) free of all
indebtedness and encumbrances of every kind contracted or
incurred while we have her, and pay as above specified un-
til so returned and delivered. St. Louis, August 29, 1856.
Louis A. Welton, (principal.) J. O. Carson & Co., (secu-
rities.)

"It is hereby understood that in case of a loss of the said
boat she will be at the risk of the owners. A. C. Goddin,
(for owners,) Louis A. Welton."

The charterers proceeded to run the boat under the terms
of the charter party, until about the 29th Nov., 1856, when
she struck upon a log, or rock, in the Missouri river and
sunk. A recovery was sought upon two grounds; *first*, be-
cause the accident was caused by the mismanagement and
unskilfulness of defendants, and those in charge of the
boat; and, *secondly*, that the defendants did not cause any
repairs to be made on said boat, and did not deliver her to
the plaintiff at the wharf in St. Louis, as by the charter
party they contracted to do. The petition stated the sink-
ing of the boat, its being subsequently raised, and that she
was taken on to the docks and repaired at a cost in all of
$4,048, including charter money claimed for the time she
was in the docks. The petition stated that the boat, after
she sunk, was abandoned by defendants, and plaintiff was
compelled to send persons and agents to take charge of said
boat, in order to save her from destruction, and take her and
place her in docks for repair.

The first ground was abandoned at the trial, and recovery
sought only on the second ground; the plaintiffs contending
that there was no loss of said boat within the meaning of

the charter party, and that charterers were liable for all except that.

On the trial, there was evidence tending to prove that the boat ran on to a sunken log, or rock, not before known to exist; that she sunk almost immediately; that her bow lay upon the shore in 3½ feet water; that she laid upon the bottom of the river with the water about 5½ feet at her stern, and from 8 to 12 feet at her starboard side, which was towards the main body of the river. That as soon as she sunk, the officers and crew of said boat constructed a bulkhead around the break in the bottom and endeavored to pump her out, and continued their efforts until they found them unavailing; that when they had stopped, the wrecking boat came up the river to her, but said that they would do nothing unless the defendant Welton, captain, would surrender said boat to them; that there was danger of the sand washing from under her and of her breaking in two, and that if she had lain there long, the ice would have cut her up; that without the assistance of the bell boat she would have been a total loss.

Upon the trial, the plaintiff asked the court to give the following instructions, all of which were refused:

1. If the jury believe from the evidence, that the steamer Keystone, at the time she was sunk and secured to the shore of the Missouri river, was not so injured but that she might within a reasonable time, by the use of proper means available to her officers, have been raised and put afloat again in a condition to be navigated, she was not lost within the meaning of the terms of the contract sued on, and it was the duty of the defendant Welton to use and employ, at his own expense, all necessary and available means and agencies to raise and put her afloat; and if they find that the employment of a wrecking or diving-bell boat was necessary to that end, and that such a boat was employed by said Welton for that purpose, said Welton was in law bound to pay the reasonable expense of such employment, and also the expense connected with the navigation of the Keystone to St. Louis,

and the expense of her dockage at St. Louis, if the jury believe that such dockage was necessary in order to her being properly repaired, and the expense of such repairs as were necessary to put her in good order and condition as when she was chartered, ordinary wear and tear excepted ; and if the jury find that the plaintiff has, by reason of the failure of defendants to pay any of said expenses been obliged to pay any of said expenses, then he is entitled to recover any amount as paid by him, with interest from the time of its payment.

2. If the jury find the facts for the plaintiff under the foregoing instruction, they will also find for him the amount which accrued for the hire of the boat, as stipulated in the contract sued on, from the day the boat was sunk until the day she was delivered to the plaintiff at St. Louis after she was docked and repaired, with interest from the last named day.

3. If the jury believe from the evidence that the surrender of the Keystone by the defendant Welton, to the wrecking boat Sub-marine No. 6, was made without the authority or consent of the plaintiff, such surrender did not discharge said Welton from the duty in relation to the Keystone, or from the liability for expenses as set forth in the first instruction above given at the request of the plaintiff.

The court gave of its own motion :

If the jury believe from the evidence, that the sinking of said boat was the result of an accident arising from the perils of navigation, and not occasioned by any want of care or skill of the said defendants, or either of them, or the servants or agents of them or either of them; that said boat was sunk and lay upon the bottom of the river with her hold full of water, and in portions over her deck ; that said boat could not be raised by any exertions of the officers and crew of said boat, but would without the exertions and appliances of the bell boat have become wrecked and lost, then the defendants were not liable for any damages resulting from said accident. But if the boat could

have have been raised and put afloat by the officers and crew, or by any means in their power, they had no right to abandon her and give her up to the control of the diving-bell boat; and in this case the defendants are liable for the costs and expenses of raising the boat, bringing her to the port of St. Louis and repairing her damages, and also for the hire of the boat until she was raised and delivered to the plaintiff, less the amount of $794.14, admitted to have been received from George K. Budd for insurance. If the jury find for the plaintiff, they may allow him interest on the amount of the cost and expenses from the time he paid them, and on the hire of the boat from the time it was delivered up to him.

The plaintiff thereupon took a non-suit, with leave to move to set the same aside.

*Drake & Wood*, for plaintiff in error.

There is no principle of law which makes the underwriters liable in the case of a merely partial loss of the ship, &c. (Bradley v. The Maryland Insurance Company, 12 Peters, 378.) Repairing injuries, not amounting to half the value of the ship, does not authorize abandonment for loss. (*Same case.*) In the same case this principle recognized, "If in all human probability the expenditures which must be incurred to deliver the ship from peril at the time, as far as any reasonable calculation can be made beyond *half her value*, and if her distress and peril be such as would induce a considerate owner uninsured and upon the spot, to withhold any attempt to get the vessel off, because of such apparently great expenditure, the abandonment would doubtless be good." Same case fixes the question of value. (5 Peters, 604.)

*Glover & Shepley*, and *F. C. Sharp*, for defendants in error.

The defendants submit the following points and authorities:

I. It is certain that the loss spoken of in the *addendum* to the charter party, and for which the said defendants were

Goddin v. Welton et al.

not to be liable, does not mean an absolute annihilation of the vessel, as many portions would exist no matter how the vessel was destroyed. The words used in the charter party are to be construed in reference to the circumstances surrounding the transaction. It is perfectly well known that on the western waters there is no such thing as the total destruction of the boat. In the cases where the loss approaches nearest to the entire destruction of the boat, there is always the " apparel and furniture," portions of the cabin and the boilers and machinery saved ; all this was perfectly well known to the parties when they entered into the agreement, and, therefore, it is obvious that they did not mean the total destruction of the boat when they made use of the term " loss."

II. The word as used must be construed in reference to the subject matter about which it was used, and must be taken to be used in its technical sense. The matter of insurance has so interwoven itself into the whole of maritime subjects, that words which have a definite and fixed meaning, as connected with insurance and agreements in reference to insurance, are used in other maritime agreements with the same meaning.

The word "loss" as used in reference to matters of insurance is a generic term, that includes within its signification both a *total* loss and a *partial* loss, and one just as much as the other.

III. But even if it be admitted that by the expression is meant a total loss, yet the loss as proved here is a total loss, for which the owners at common law would be entitled to abandon the boat to the insurers. ( Cambridge v. Adderton, Ry. & Mood, 60 ; King v. Middletown Ins. Co., 1 Conn. 184 ; King v. Hartford Ins. Co., 1 Conn. 333 ; 2 Arnould on Ins., 1008.)

The only reason why in all cases similar to the present one there is not an abandonment of the boat to the insurers is, that there is a special provision inserted in all the policies upon boats navigating the western waters, which forbids them to abandon.

Indeed it enters into the idea of the right to abandon, not only that the vessel exists in *specie*, but there must also be a *chance of recovery*. If the vessel exists in *specie*, and there is *no* chance of recovery, then there is no necessity for an abandonment. (2 Arnould on Ins., t. p. 1087 ; Brig Sarah Ann, 2 Sum. 215–16 ; 11 Johns. 295.)

That it was a total loss within the meaning of the law is beyond question. She could not be raised ; she was in danger of breaking up ; all the appliances that could be used were used. Therefore, it was a total loss, unless such extraordinary means as the parties owning the bell-boats use could raise her, paying to them 33 per cent. of the value of the boat for the salvage service ; and if they were bound to pay that, they would be bound to pay five-sixths of the value if she could be raised.

IV. Apart from any technical meaning, the charter party taken together, shows that the *addendum* was intended to protect the charterer from any loss, total or partial.

The true rule of interpretation as to charter parties, has been laid down by the Supreme Court of the United States, in the case of Raymond v. Tyson, 17 How. 53, when the court held that charter parties have frequently unprecise and inconsistent stipulations, and they must, like other mercantile contracts, be liberally interpreted in furtherance of the intention of the parties.

BATES, Judge, delivered the opinion of the court.

The instruction given in this case is based upon a very fair construction of the contract, which is the foundation of the suit. The main object of the contract was the chartering of a steamboat to run in the Missouri river, and this controversy arises upon the construction of that part of it which declares that " in case of a loss of the said boat she will be at the risk of the owners." The plaintiff contends that the accident which happened to the boat did not cause its loss, while the defendants contend that the boat was lost within the meaning of the contract.

It is obvious from the language of the contract, that an entire destruction or annihilation of the boat was not the loss contemplated by the parties when they made the contract; and it is very reasonable to conclude that the loss intended was such as would entirely defeat the object of the contract, that is, the running of the boat in the Missouri river. In this view, the instructions asked by the plaintiff were manifestly wrong, and were properly refused, and the instruction given by the court was fully as favorable to the plaintiff as it could properly be; as it made the defendants liable if the boat could have been raised and put afloat by any means in the power of its officers and crew.

Judgment affirmed. The other judges concur.